UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL J. WHITNEY, | : | **CIVIL NO.  4:06-CV-1890** |
| | : | |
| Plaintiff | : | (Judge McClure) |
| | : | |
| v. | : | (Magistrate Judge Smyser) |
| | : | |
| MICHAEL J. ASTRUE[1], | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

The plaintiff has brought this civil action under the authority of 42 U.S.C. § 405(g) to obtain judicial review of the decision of the Commissioner of Social Security denying the claim of the plaintiff for Social Security disability insurance benefits.

On January 13, 2003, the plaintiff, Michael J. Whitney, applied for disability insurance benefits.  He claimed that he

---

1.  Michael J. Astrue became the Commissioner of Social Security, effective February 12, 2007, to succeed Linda S. McMahon. Under Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. 405(g), Michael J. Astrue is automatically substituted as the defendant in this action.

became disabled on November 17, 1997, as the result of an injury to his right wrist, seizure disorder, learning disability and depression and/or anxiety.  The claim was denied initially and on reconsideration.  The plaintiff filed a request for a hearing.  Two hearings were held before an administrative law judge (ALJ).  The first hearing was held on April 8, 2004 (Tr. 74-124) and the second hearing was held on September 9, 2004 (Tr. 32-73).

The plaintiff testified at both hearings and a vocational witness testified at the second hearing.

Before testimony on April 8, 2004, the ALJ elicited from the plaintiff's representative the allegedly disabling impairments after November 17, 1997, and the representative replied, "right wrist injury, a seizure disorder, depression, anxiety, and a learning disorder." (Tr. 77).  Also, the ALJ announced her decision to consider the disability insurance benefits claim back to November 17, 1997.

2

The plaintiff stated in his testimony that the November 17, 1997 disability date was selected because his right wrist injury then made it not possible for him to work.  He had been doing factory work.  He received workers compensation for two years and a settlement at the end of that period.  After that, he tried to work and keep jobs. His fiancé, with whom he lives, does not work and receives social security disability payments. She has anxiety attacks, depression and a knee problem.

He stated that he does not have a valid driver's licence, having lost it because of a DUI conviction.  He has had multiple incarcerations.  He was incarcerated for not paying on a fine, for corruption of a minor, for failing to pay child support, for not paying on fines, and for bad checks.

He stated that he completed the twelfth grade, in special education.  He later tried to return to school but he was unable to complete the program.  He was in the Marine Corps in 2001 and 2002 for about four months, but was honorably medically discharged.

The work that he has done the most in the past fifteen years has been cooking, principally fast food cooking.  He has also done factory work.  He operated a circular saw.  He worked as a bagger in a Giant grocery store.  In one restaurant job he was both a dishwasher and a prep cook.

The plaintiff stated, in response to questioning by the ALJ, the impairments and symptoms for which he saw his various medical providers and how often he saw each provider.  The plaintiff stated that Dr. Adam Wasserman has seen him for the longest and would know him the best.  Dr. Wasserman, however, stopped seeing him in 2003 as the result of the plaintiff's unpaid medical bills.  He has seen Dr. Surya, a psychiatrist, at Wellspan, about five times.

The plaintiff acknowledges that he took himself off Zoloft in November of 2003 without medical advice to do so, but he told his family doctor that he did so.  He has been critical of several of the doctors who have treated him.

4

He stated that he has a six-year-old son, who is living with his mother, as to whom his right to visitations is suspended and that "[t]hey're waiting to hear what is going on with, on with my Social Security.  If I get on it or not."

At the resumed hearing, on September 9, 2004, the plaintiff stated that his seizure disorder was diagnosed in 1997.  Dr. Rothman, a family doctor, provided primary care for the seizure disorder.  Since November 17, 1997, he has been on medications for seizures and has had no emergency room visits or hospitalizations for seizures.  In that time he has had about fifteen to twenty seizures.  In some of these, he has lost consciousness.  On some occasions he has stopped taking medications, either because he had limited funds or because it caused sickness or because he forgot to take it.

The ALJ reviewed the plaintiff's incarcerations with the plaintiff and the amount of fines still unpaid and owed by the plaintiff.

The plaintiff testified that he expects to have wrist pain all of his life.  He has limited movement in his wrist.

He has depression and anxiety.  He sees a counselor. He has taken a medication, Zoloft, which he discontinued because of a concern that it could aggravate his seizure disorder.  He did not talk with his doctor about discontinuing his Zoloft regimen.  He has not, since November 17, 1997, been hospitalized for depression or anxiety.

His depression and anxiety prevent him on some days from doing anything.  His depression and anxiety have been worse since he injured his wrist.  He has worked at some jobs since 1997; however, absenteeism and physical and mental limitations have led to his loss of the jobs that he started.

In a typical day he participates with his fiancé in performing chores.  He rises at about 8:00 a.m. and goes to bed after midnight.  On some nights he has difficultly sleeping because of his wrist pain.

6

He experiences wrist pain every day.  The pain ranges from sharp to dull.  It sometimes is a shooting pain.  The pain can be enhanced by coldness, by doing too little or by doing too much.  There is not a full range of motion in his wrist.  His wrist limits what he can lift, but he can lift a 50 pound bag of dog food with difficulty.

He feels guilty or worthless almost all of the time.  He cries easily.  He has thought of suicide.  He is irritable.  His memory is poor.  It is hard for him to concentrate.  He has lost interest in doing things that he used to like to do.  He often feels tired.  He experiences panic attacks, resulting from stress and depression.  He had difficulty in school, and he was in special classes.  He can not read well.  He can not fill out forms.  He avoids crowds.

He does not often see his son.  He has few friends, has a poor relationship with his mother, gets frustrated easily, gives up easily, and has missed a lot of work due to sickness.

He stated that he began to use alcohol at age sixteen and marijuana at age seventeen.

A vocational witness testified. (Tr. 62-72). A residual functional capacity[2] with a "light exertional base" and other limitations was assumed for the plaintiff. (Tr. 68). Given that assumed residual functional capacity, he can not perform his past relevant work. (Tr. 69).

The vocational witness next stated that he is familiar with the range of occupations which are characterized by the Commissioner as unskilled work. *Id*. The vocational witness stated that were the full range of jobs within the category of unskilled work to be reduced by the exclusion of those jobs that could not be performed by someone with the plaintiff's residual functional capacity as it had been articulated by the ALJ, this would reduce the universe of unskilled jobs by forty

_____

2. "Residual Functional Capacity" is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Commissioner of Social Security Adm.,* 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)).

percent. (Tr. 70).  If the same reduction were made at the

sedentary level, the erosion would be fifty percent.


The ALJ then stated to the vocational witness:

> Now, for the next RFC, it's going to be
> the same as the first, except that I'm
> going to add something.  Everything else
> will remain the same.  What I'm adding is
> because of occasional difficulties with
> depressed mood, tearfulness, irritability,
> memory, concentration and pace, this
> individual is limited to, but remains able
> to understand, remember and carry out
> simple instructions. Make simple work-
> related decisions.  Respond appropriately
> to supervision, co-workers and usual work
> situations and handle changes in a routine
> work setting appropriately all on a
> sustained and continuing basis.  Finally,
> working  directly with the public is
> limited to occasionally.  Now, sir, with
> that additional set of limitations, the
> earlier erosion of a light unskilled base
> was 40 percent, is there any further
> erosion?

(Tr. 70-71).  The vocational witness stated:

> No.

(Tr. 71).


    The vocational witness stated that if the worker left

the work site for fifteen minutes a day, that would jeopardize

9

employment.  If he missed a day a week, that would preclude
employment.

On December 10, 2004, the ALJ issued her decision
denying the plaintiff benefits. (Tr. 20-31).  The Appeals
Council denied the plaintiff's request for review (Tr. 6),
making the ALJ's decision the final decision of the
Commissioner.

The plaintiff filed his complaint with this court on
September 26, 2006.  The defendant filed an answer to the
complaint and a copy of the administrative record on December
4, 2006.  Pursuant to Local Rules 83.40.4 and 83.40.5 and this
court's Order of January 22, 2007, the plaintiff filed his
brief on February 21, 2007 and the defendant filed his brief on
March 29, 2007.  Plaintiff filed his reply brief on April 12,
2007.

If the Commissioner's decision is supported by
substantial evidence it must be affirmed. 42 U.S.C. § 405(g).
Substantial evidence means "such relevant evidence as a

reasonable mind might accept as adequate to support a
conclusion." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir.
1999)(quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.
1995).  Substantial evidence is more than a mere scintilla of
evidence but less than a preponderance. *Brown v. Bowen*, 845
F.2d 1211, 1213 (3d Cir. 1988).

A single piece of evidence is not substantial evidence
if the Commissioner ignores countervailing evidence or fails to
resolve a conflict created by the evidence. *Mason v. Shalala*,
994 F.2d 1058, 1064 (3d Cir. 1993).  However, in an adequately
developed factual record, substantial evidence may be
"something less than the weight of the evidence, and the
possibility of drawing two inconsistent conclusions from the
evidence does not prevent [the decision] from being supported
by substantial evidence." *Consolo v. Federal Maritime Comm'n*,
383 U.S. 607, 620 (1966).

To facilitate review of the Commissioner's decision
under the substantial evidence standard, the Commissioner's
decision must be accompanied by "a clear and satisfactory

11

explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id*. at 706-707.  In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole.  *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner has promulgated regulations creating a five-step process to determine if a claimant is disabled.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and, (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920.

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he is unable to engage in his past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

In this case the ALJ determined that the plaintiff has not engaged in substantial gainful activity since the alleged onset date, that he has impairments that are severe ("status-post right wrist injury, and cannabis abuse until 1999"), that his impairments do not meet or equal any listed impairments, and that he is not able to perform his past relevant work.  The ALJ further determined that the plaintiff has the residual functional capacity to perform a significant range of light work.  The ALJ then used Medical-Vocational Rule 202.18 as a basis for finding there to be substantial gainful activity that the plaintiff can perform, reasoning that since he can perform

forty or fifty percent of the full range of light or sedentary unskilled jobs there are jobs that he can perform.

On the basis of these findings, the ALJ found the plaintiff not to be disabled.

The plaintiff argues that the ALJ did not properly address and evaluate the plaintiff's impairments, that the ALJ did not explain how opinions of the plaintiff's medical providers were evaluated, and that the ALJ failed to address the relevant evidence that supports the plaintiff's claim.

The argument that the plaintiff's impairments were not properly addressed and evaluated is directed at the ALJ's election to limit the impairments that she stated that she found to a "status-post right wrist injury" and a "period of cannabis abuse ending in 1999." The plaintiff asserts that it was error for the ALJ not to have included his mental impairment(s) as a severe impairment. This is an argument that there is not substantial evidence to support a finding that the plaintiff does not have a severe mental impairment.

14

The Commissioner in his brief argues that the finding of the ALJ that the plaintiff does not have a severe mental impairment is supported by the plaintiff's daily activities, the May 2003 findings of Dr. Fink, the results of mental status examinations performed by Ms. Griffith in August 2000 and Dr. Surya in July 2003, the plaintiff's ability to care for personal needs and to get along with people, the plaintiff's treatment history, a Global Assessment of Functioning score of 68 in 2001, the plaintiff's cessation of Zoloft, and the plaintiff's denial in April of 2003 of feelings of depression and sadness.

The evidence of a severe mental impairment in this record is, however, very pronounced and very pervasive.  Some of this evidence is stated in the ALJ's summary of medical evidence, but it is not addressed in the ALJ's discussion and reasoning.  After summarizing the medical evidence (Tr. 23-27), the ALJ sets forth her conclusion that the plaintiff's mental health treatment has been inconsistent with his complaints. (Tr. 27).  The ALJ supports her opinion that there is not a severe mental impairment with the observation that the

15

plaintiff has not consistently pursued courses of treatment for seizures and for depression and has stopped medications without physician input for reasons that may not have medical validity such as a perception that Zoloft will interfere with seizure medication.

When one has read the record, it stands out as a very questionable aspect of the ALJ's decision for the ALJ to have identified the plaintiff's severe impairments as merely "status-post right wrist injury, and cannabis abuse until 1999." It is very difficult to understand how or why the ALJ did not find there to be severe mental impairments.

The plaintiff is treated on a current and ongoing basis for a seizure disorder, stress and anxiety. There have been some low Global Assessment of Functioning scores for the plaintiff which, if accurate, establish serious symptoms and impairments. The ALJ acknowledged this (Tr. 25), but disregarded all medical source evidence and instead "considered the administrative findings of fact made by the State Agency medical physicians and other consultants" and considered these

administrative findings "as a statement from a nonexamining

expert source" and found "this opinion persuasive based on the

sporadic mental health treatment." (Tr. 27).


     As noted above, *Cotter v. Harris* requires an explained

decision.  The ALJ does not reasoningly explain either the

reliance upon a bare and unexplained nonexamining state agency

physician's opinion as against many treating physicians'

opinions implying a serious mental condition or explain the

inference of sporadic treatment.  The statement by the ALJ in

her decision that there was sporadic treatment follows a

lengthy description of treatments by ten or more doctors. (Tr.

23-26). The evidence cited by the ALJ that overcomes ten

doctors' extensive reports is a virtually non-communicative

form (Tr. 332-346) which reports that the plaintiff has no

restriction of activities of daily living and no difficulties

in maintaining social functioning. (Tr. 342).  It was by all

reasonable inferences a flagrant oversight for the ALJ to have

accepted this form as better evidence than the reports of the

medical practitioners who actually examined and treated the

plaintiff.  The explanation by the ALJ, sporadic mental health

treatment, does not bear scrutiny as a basis for a finding of no severe mental impairment.

One of the plaintiff's arguments concerns the ALJ's lack of any discussion of several low Global Assessment Functioning scores, including a score of thirty-five assigned by a health care provider, Mr. Sette.  The defendant argues that the ALJ did consider the opinion of Mr. Sette that on July 24, 2001 the plaintiff's Global Assessment of Functioning score was thirty-five.  The defendant's argument that the ALJ considered and rejected that opinion is not correct.  The defendant's brief contains an assertion of reasons why Mr. Sette's opinion was "properly discounted."  The court's focus in a 42 U.S.C. §405(g) review is upon the decision of the Commissioner.  Fact finding and rationales for factual inferences stated in the Commissioner's brief are not an appropriate focus.  The ALJ did not consider the Global Assessment of Functioning score of thirty-five.  The ALJ mentioned Global Assessment of Functioning scores for the plaintiff of forty-five and fifty-five (Tr. 25), but did not state reasons for rejecting or discounting these scores other

18

than the sole and overarching conclusory rationale of sporadic mental health treatment.

The defendant repeatedly emphasizes various mental health professionals' reports' inconsistency with "the state agency psychological consultant's conclusion" as a putatively self sufficient reason for the ALJ's rejection of those professionals' reports and her rejection of inferences of a severe mental impairment.  The defendant does not in his brief set forth any particular reasons based in methodology, technique, or other indicators of objectivity and reliability to accept the one professional's report over the opposing numerous professionals' reports, and neither did the ALJ.

The defendant in his brief advances it as self-apparent that reading, trimming trees, playing cards, clearing property, attending to pets, watching movies, cleaning and visiting, activities attributed to the plaintiff, are inconsistent with a severe mental impairment.  The defendant does not cite a mental health expert source for this assertion.  The defendant does not reconcile this assertion with the mental health

19

professionals' opinions and the low Global Assessment of Functioning scores.

The ALJ's rejection of low Global Assessment of Functioning scores and mental health professionals' reports and opinions is based upon a suspicion that the plaintiff was not credibly reporting his symptoms because he was trying to be found disabled.  The ALJ, however, also found the plaintiff's self-reported activities to be inconsistent with the mental health experts' opinions and the Global Assessment of Functioning scores.  These reasons do not readily appear to be consistent.  Some further explanation could possibly reconcile the apparent inconsistency.

The Commissioner's brief concludes with a suggestion that a case should not be remanded when there is not a reason to believe that on remand a different result might be reached. The plaintiff's briefs, on the other hand, present clear and compelling reasons why a remand in this case is necessary.

In our view, in a case such as this in which the Commissioner's explanatory burden is not met, and in which the court can not make a determination on the basis of applicable legal standards that the Commissioner should be ordered to pay benefits, the correct order for the court to enter is that the case be remanded for the Commissioner to reconsider the case. Accordingly, although the Commissioner appears to request a thumb up or a thumb down and not a remand, it is recommended that this case be remanded to the Commissioner for further consideration of, in particular, whether the plaintiff has a severe mental impairment.

/s/ J. Andrew Smyser
J. Andrew Smyser
Magistrate Judge

Dated:  May 2, 2007.